**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0930n.06

**No. 11-2257**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Aug 21, 2012*

LEONARD GREEN, Clerk

MELVIN MCCOLLUM,                                    )
                                                   )
    Plaintiff - Appellant,                         )
                                                   )
                                                   )   ON APPEAL FROM THE
v.                                                 )   UNITED STATES DISTRICT
                                                   )   COURT FOR THE EASTERN
LIFE INSURANCE COMPANY OF                          )   DISTRICT OF MICHIGAN
NORTH AMERICA, CIGNA GROUP                         )
INSURANCE, FASTEN TECH MICHIGAN                    )
HOLDINGS, INC., FABRISTEEL PRODUCTS,               )   **OPINION**
INC., and DONCASTER GROUP, LTD.,                   )
                                                   )
    Defendants - Appellees.                        )

Before:  MOORE, WHITE, and LUCERO, Circuit Judges.[*]

**HELENE N. WHITE, Circuit Judge.**  Plaintiff-Appellant Melvin McCollum appeals the district court's order upholding the denial of long-term disability benefits under an insurance policy issued by Defendant-Appellee Life Insurance Company of North America (LINA) and governed by the Employee Retirement Income Security Act of 1974 (ERISA).  29 U.S.C. §1001 *et seq*.  We REVERSE and REMAND in part and AFFIRM in part.

**I.**

A.    McCollum's Injury and Disability Benefits

---

[*]The Honorable Carlos F. Lucero, Circuit Judge for the United States Court of Appeals for the Tenth Circuit, sitting by designation.

McCollum began working for Fabristeel Products, Inc., in June 1993 as a cold header operator. LINA, doing business as CIGNA Group Insurance (CIGNA), issued a group Long Term Disability (LTD) Income Policy to Fabristeel, as well as a group Life Insurance Policy providing Waiver of Premium (WOP) benefits. JA 30, 322. The LTD Policy provides:

> An Employee will be considered Disabled if because of Injury or Sickness: he is unable to perform all the material duties of his regular occupation; and after Monthly Benefits have been payable for 36 months,[1] he is unable to perform all the material duties of any occupation for which he is or may reasonably become qualified based on his education, training or experience.

JA 34. The WOP benefit defines disability similarly: "A covered employee will be deemed 'disabled,' as used here, only if he can not do any work for wage or profit." JA 346. Both policies require proof of continued disability and provide that benefits terminate if McCollum ceases to be disabled.

Around July 9, 1996, McCollum was lifting a 75-pound container of bolts when the handle broke, causing an injury to his right shoulder rotator cuff.[2] He has not worked at Fabristeel since. In November 1996, he underwent right shoulder surgery. McCollum completed physical therapy in May 1997, but the attending physician reported that McCollum had little improvement in his neck or shoulder pain at that time and that as a result he was "permanently disabled from medium or heavy type of work that he was previously doing." The attending physician also noted "fairly prominent degenerative joint disease throughout the lumbar spine and quite prominent canal

---

[1]In a different version of the Policy in the record, the period an insured must wait before becoming eligible for LTD benefits is listed as 24 months. R.16 Ex. 1 at 3b. This difference has no impact on the issues in this appeal.

[2]Apparently, McCollum sustained a prior injury when he became tangled in a machine at work in February 1995, before his accident in July 1996.

2

stenosis," noting that any work retraining would "have to take into account the lumbar region as well, with input from other physicians."[3] JA 82. In addition to his back and shoulder problems, McCollum is obese and suffers from diabetes and hypertension.

Dr. Adam Kellman, McCollum's long-time treating physician, referred McCollum to Dr. Stephen Boodin in July 1997 to assess his back problems. Dr. Boodin reviewed x-rays, CT scans, and an MRI, which revealed, among other things, significant narrowing of the spinal canal at L-4-5 and L-5, S-1. Dr. Boodin then noted that McCollum suffered from "significant degenerative changes in the lumbar spine with a definite lumbar radiculopathy" and explained that "surgical decompression is likely his only rational option." Dr. Boodin also noted that epidural steroid injections were not alleviating McCollum's pain. JA 227-28.

On April 28, 2005, McCollum saw Dr. Stephen Pomeranz for his back pain. Dr. Pomeranz noted that McCollum had severe canal stenosis and spondylolisthesis at L5-S1, along with facet arthrosis contributing to moderate to severe canal stenosis at L4-L5 and L2-L3. JA 80-81. Eventually, in July 2005, McCollum underwent a laminectomy for his back pain. JA 21, 97.

LINA approved LTD benefits for McCollum beginning January 6, 1997. On April 21, 1998, LINA also granted WOP benefits to McCollum, a determination based on two findings: (1) Dr. Kellman's determination that McCollum was capable of only sedentary work; and (2) a Transferable Skills Analysis ("TSA"), using Dr. Kellman's sedentary-work finding, that found no job matches suitable for McCollum. JA 376-79. On August 11, 1999, LINA began the process of determining

---

[3]Spinal stenosis is a "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space" that may either congenital or due to spinal degeneration and includes pain as among its symptoms. *Dorland's Illustrated Medical Dictionary* 1770 (32d ed. 2012).

whether McCollum was capable of performing *any* occupation. JA 196. On February 17, 2000, LINA determined that McCollum was totally disabled from performing the work of any occupation and approved LTD benefits on this basis. JA 184, 207. LINA continued to provide LTD and WOP benefits until at least 2005.[4]

During the period LINA granted benefits, Dr. Kellman submitted several Physical Ability Assessments (PAA) to LINA as part of the requirement to document continued disability. JA 178-182, 364. In each of these PAAs – December 19, 2002, November 25, 2003, October 18, 2004, September 15, 2005, and July 20, 2006 – Dr. Kellman classified McCollum as capable of performing sedentary work due to his chronic lumbar pain. Apparently satisfied with the findings in these PAAs, LINA continued to provide benefits. McCollum also receives monthly Social-Security disability benefits.

B.     LINA Denies Benefits

In August 2006, as part of its periodic review of McCollum's benefits, LINA requested that McCollum provide a Disability Questionnaire and that Dr. Kellman complete a PAA. This PAA, in contrast to earlier ones, required the physician to specify the number of hours the patient could engage in various activities. JA 128. On September 15, 2006, Dr. Kellman submitted the PAA ("the September PAA") stating that McCollum could sit frequently, defined as up to 5.5 hours. The September PAA also states that McCollum can occasionally, defined as less than 2.5 hours, stand, walk, lift up to fifty pounds, and carry up to twenty pounds. Dr. Kellman noted that McCollum could frequently balance, occasionally stoop and kneel, and continuously use both hands for fine

---

[4]The parties address disability issues regarding the LTD and WOP benefits concurrently, and we do so as well.

manipulation and frequently use his hands for simple grasping. Also in contrast to earlier PAAs, the September PAA does not contain a space in which a physician classifies the category of work, such as heavy, medium, light, or sedentary, an insured is capable of performing.

Based on the September PAA, LINA referred McCollum's file to a Certified Vocational Rehabilitation Counselor, who conducted a TSA on September 21, 2006. JA 130. According to LINA, a TSA "compiles information on your restrictions, limitations, education level, prior work history, and prior training to determine what jobs, if any, you are capable of performing." JA 357. The TSA, which was explicitly based on the information contained in Dr. Kellman's September PAA, listed two jobs – Auto Casting Machine Operator and Nut-Bolt Assembler – that were suitable positions. Both jobs are categorized as "light." Accordingly, on September 22, 2006, LINA informed McCollum that it was discontinuing WOP benefits:

> In summary, based upon the pertinent vocational and medical documentation contained in our file, we have determined you retain the capacity to perform light strength level work. As a result of alternate occupations, we have concluded you do not satisfy the policy definitions of disability as defined the contract.

JA 356-57. The record is unclear whether LINA determined McCollum was capable of light work or whether the Vocational Rehabilitation Counselor made that determination. Both the TSA and LINA's denial letter are based on Dr. Kellman's September PAA. The letter also explained that McCollum could appeal the denial.

### C. Administrative Appeals Process

On October 6, 2006, immediately after LINA communicated its decision to McCollum, Dr. Kellman sent a letter to LINA to clarify that his September PAA was not intended to reflect a change in McCollum's status:

> At this time, it is my medical opinion that Mr. McCollum is unable to return to work in any capacity. The form I completed and mailed to Cigna [LINA] on 9/15/06 was not a release to return to work. Due to the fact that Mr. McCollum is able to do small tasks involving his small motor skills and walking, it was not my opinion that he is able to return to employment.

JA 127 (clarification added). On November 8, 2006, Dr. Kellman submitted a second PAA (the November PAA). The November PAA revised McCollum's limitations by noting that McCollum could not sit frequently; could not lift weight more than ten pounds; and could not carry any weight whatsoever. JA 77. Along with the revised PAA, Dr. Kellman provided a letter stating that the new PAA "should clearly state that in my medical opinion Mr. McCollum is totally disabled and not able to return to work in any capacity." JA 76. On December 21, 2006, Dr. Kellman informed LINA that if the information he submitted was inadequate, LINA should seek a second medical opinion from an orthopedic neurosurgeon. JA 126.

LINA enlisted the assistance of an independent medical reviewer, Dr. Harvey Popovich, an occupational medicine physician. Dr. Popovich reviewed McCollum's file on April 22, 2007, acknowledging that he had not examined McCollum. JA 119. Dr. Popovich opined that McCollum was capable of engaging in gainful employment:

> The claimant's reported pain complaints are supported by the records provided, but his reported limited abilities are not supported by the clinical findings on review of the medical. Mr. McCollum is a 57-year-old male diagnosed with chronic lumbar pain status post laminectomy on 7/6/05. He is alleging total disability and he last worked on 7/10/96. The records provided for my review document the patient's history of lumbar laminectomy and reduced range of motion in the lumbar spine, cervical spine, and right shoulder. The records do not describe loss of strength in the upper extremities or other focal neurological findings. Consequently, I believe Mr. McCollum is capable of engaging in gainful employment activities.
>
> It is my independent medical opinion based upon review of the records provided that Mr. McCollum's reported pain complaints are supported by his history of degenerative lumbar changes and status post lumbar laminectomy. However, the

records do not offer objective findings in support of complete inability to engage in employment activities. The records describe that Mr. McCollum has improved post lumbar surgery, but they do not describe loss of strength in the upper or lower extremities.

***

Based upon review of the records provided, the patient is capable of working in a light duty capacity. That is to say he is capable of lifting up to 20 pounds on an occasional basis and up to 10 pounds on a frequent basis. He is not a candidate for activities requiring bending or twisting at the waist on more than an occasional basis. Additionally, he should not work with his right arm above shoulder level.

JA 123-24. Dr. Popovich explained that he attempted to contact Dr. Kellman, but that he only came to the phone long enough to state that he was too busy to discuss the case. *Id.* Dr. Popovich's report discusses Dr. Kellman's September PAA but makes no mention of Dr. Kellman's November PAA. In May 2007, LINA conducted another TSA, this time using Dr. Popovich's April 2007 report classifying McCollum as capable of performing light work. This TSA again found two suitable jobs, both of which were classified as light work. JA 116.

In the meantime, McCollum submitted additional documents to support his claim, including office notes from Dr. Eric Kovan. Dr. Kovan also completed a PAA in July 2007, which, consistent with Dr. Kellman's November 8 PAA, stated that McCollum could only occasionally sit, stand, walk, and reach. JA 117. Dr. Kovan also stated that McCollum could continuously grasp with his hands and frequently grasp firmly. He stated that McCollum could occasionally lift and carry up to twenty pounds and frequently carry ten pounds. Dr. Kovan's office notes consistently state McCollum has "horrific spinal stenosis" and his opinion that McCollum "will [not] ever be able to do work again due to the severity of his back disease." JA 103-06; 113-14 ("He is unable to do any activity secondary to the above symptomatology."). Dr. Kovan's notes describe the progression of

7

medicine used to treat McCollum's back pain, including Duragesic patches, increasing from 25mcg to 100mcg, as well as the placement of a spinal cord stimulator around March 18, 2008.  JA 86.

In response to a letter from LINA asking for clinical findings of McCollum's severe spinal stenosis, Dr. Kovan wrote to LINA on September 20, 2007:

> As you know, I have been taking care of Melvin for an extended period of time.  In lieu of your question, I would like to note that his examination findings revealed decreased range of motion on lumbocacral [sic] spine with increased radicular pain with extension and positive straight leg raising.  He has mild weakness in the L5 musculatures being 5-/5 bilaterally with a severe antalgic gait, where he is wide-based and forward flexed when he ambulates.  Reflexes are diminished in the Achilles tendon compared to the patellae bilaterally.  Due to the above, he will need long-term disability.

JA 112.

LINA provided the additional documentation – mostly Dr. Kovan's notes – to Dr. Popovich. In December 2007, Dr. Popovich reached essentially the same result as he did before, explaining that Dr. Kovan's medical notes generally describe McCollum's physical examination as non-focal with respect to strength, reflexes, and sensation.  JA 92.  Dr. Popovich thus concluded that the "objective information does not support an inability on the part of Mr. McCollum to participate in gainful employment activities.  It remains my determination that Mr. McCollum is capable of working in a light duty capacity."  JA 92.

On January 22, 2008, LINA informed McCollum that it was denying his claim for LTD benefits based on Dr. Popovich's finding that McCollum was capable of working in a light duty capacity and the TSA's identification of two jobs suitable for McCollum.  JA 62-65.  McCollum appealed, submitting further evidence, including documentation of the spinal cord stimulator.  Dr. Mendez, an associate medical director at LINA, agreed with Dr. Popovich that the medical records

8

did not demonstrate physical limitations to "preclude Mr. McCollum from performing any sedentary or light occupations." JA 84-85. LINA affirmed the denial on May 5, 2008:

> We do not dispute you may have been somewhat limited or restricted due to your subsequent diagnoses and treatment as you were approved long Term Disability benefits through January 22, 2008; however, an explanation of your functionality and how your functional capacity prevented you from continuously performing the material duties of any occupation beyond January 22, 2008 was not clinically supported. The presence of a condition, diagnosis or treatment does not necessarily equate to a presence of a disabling condition or decreased level of functionality. As such, the results of the Transferable Skills Analysis performed on May 22, 2007 remain valid.

JA 25-26.

McCollum again appealed, submitting a letter on September 18, 2008 stating that "[e]ach physician I have been in the care of support [sic] my claim for long term disability. I have also requested that one of your physicians examine me. I am confident that if you had an objective Physician on your staff perform and [sic] exam, they would draw the same conclusion." JA 74. McCollum also submitted a June 17, 2008 letter from Dr. Kovan, which stated:

> [McCollum] was diagnosed with severe spinal stenosis via imaging and back and radicular pain. From May 15, 2007, through my last visit on May 13, 2008, we have been treating Melvin extensively for his spinal stenosis. First, a series of epidural injections were given. Medications including Lyrica and nerve medication was also used to help with the neuropathic pain. In addition, medication such as Percocet, Duragesic patches have been given up to dose of 100 mcg of Duragesic patch, which is Fentanyl for his pain management. With all of the above treatments, we have not been able to give him any significant relief for shorter than one or two weeks of time. I had the pleasure of seeing Melvin as scheduled over the last year. Other treatment dates included June 26, 2007, August 2, 2007, August 30, 2007, September 24, 2007, October 3, 2007, December 4, 2007, February 5, 2008, and May 13, 2008. During all of these visits, it has been noted his examination was very limited due to pain. He had difficulty with forward flexion and extension. He had positive straight leg raising bilaterally with positive findings of severe spinal stenosis of lumbosacral spine. We did talk about history of getting the pain stimulator with really minimal improvement. Patient did receive a pain simulator [sic] but that gave him no relief. Severe depression secondary to increasing pain had been noted. He is on the Vicodin

9

HP presently at this time one tablet four times a day. I am unable to give him further injections, as he has not gotten any relief. Due to the above, Mr. McCollum should be on long-term disability. He is unable to work at this time or in near future as he has reached maximum medical improvement.

JA 75. On November 4, 2008, after a different medical director at LINA reviewed McCollum's file, LINA again affirmed the denial, concluding that "the information available is insufficient to support a functional loss to prevent you from performing any occupation." JA 71-73. Since his appeal process was complete, LINA informed McCollum that it would accept no further appeals. *Id.*

D. McCollum Files Suit

Having exhausted his administrative appeals, McCollum sought information from Defendants to enable him to file this lawsuit. The Policy did not list a plan administrator or sponsor, so McCollum, through counsel, contacted CIGNA, the insurance company that had denied his claims, in July 2009 and September 2009, seeking a summary plan description (SPD). JA 66, 58. CIGNA responded on September 15, 2009 that McCollum could obtain an SPD from the employer who provided the Policy to McCollum. JA 24. McCollum then wrote to Fabristeel and Whitesell[5] in

---

[5]McCollum initially brought suit against LINA, doing business as CIGNA, and Whitesell, doing business as Fabristeel Products, Inc., based on his understanding that Whitesell was the current owner of Fabristeel. R.1, Complaint. The parties stipulated to dismissing Whitesell, however. R.29. Fabristeel has changed hands at least twice since McCollum was employed there. According to a note in Defendants' Answer:

At the time of his employment, Plaintiff claims he worked for FabriSteel Products Inc. ("FabriSteel"). At that time, however, FabriSteel was owned 100% by FastenTech, Inc. Subsequently, on September 10, 2004, the assets of FabriSteel were sold to Whitesell International Corporation ("Whitesell"). Immediately after the sale of assets to Whitesell, FabriSteel changed its name to FastenTech Michigan Holdings, Inc. FastenTech, Inc. is owned by FasTech, Inc. On May 15, 2007, Dundee Holding, Inc., a Delaware corporation, purchased 100% of the shares of FasTech, Inc. Dundee Holding, Inc. is the United States part [sic] company for Doncasters Group Limited, a UK company.

10

December 2009 and January 2010, requesting the SPD. R.16, Ex. 1; Ex. 3. Although Defendants searched for the SPD, they admit that they were unable to locate one, and it is unclear whether an SPD was ever drafted. *McCollum v. Life Ins. Co. of N. Am.*, No. 10-11471, 2011 U.S. Dist. LEXIS 101205, at *7 (E.D. Mich. Sept. 8, 2011); *see also* Appellees' Br. at 29.

McCollum filed this lawsuit on April 13, 2010. The second Amended Complaint contained three counts: a claim alleging that Defendants improperly terminated the LTD benefits (Count I); a claim for civil penalties based on Defendants' failure to provide the SPD (Count II); and a claim that Defendants improperly terminated the WOP benefits (Count III). R.16. After the district court granted limited discovery to McCollum to determine the existence of the SPD and any efforts made by Defendants to locate it, R.25, the parties filed cross-motions for summary judgment. The district court granted summary judgment to McCollum on his claim for civil penalties, awarding nominal damages of $5 per day. On the main issue whether LINA properly terminated McCollum's LTD and WOP benefits, however, the district court granted summary judgment to LINA. *McCollum*, 2011 U.S. Dist. LEXIS 101205, at *12-19. McCollum timely appealed.

**II**.

The central issue is whether LINA properly terminated McCollum's LTD and WOP benefits. 29 U.S.C. § 1132.[6] When the benefit plan does not give the administrator discretionary authority to determine eligibility for benefits or construe the terms of the plan, this court reviews the

R.22, PageID 185 n2; *see also* Appellee's Br. at 28. For purposes of this appeal, however, the important point is that Doncasters now own Fastech, the company that owns Fabristeel.

[6]In pertinent part, the statute provides that a "participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1)(B).

11

administrative record de novo. *Marks v. Newcourt Credit Group, Inc*., 342 F.3d 444, 456 (6th Cir. 2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989)); *see also Wilkins v. Baptist Healthcare Sys., Inc*., 150 F.3d 609, 615 (6th Cir. 1998). Because there are no plan documents granting discretion to the administrator, the district court reviewed LINA's benefits decision de novo, a ruling neither party challenges. Under de novo review, a reviewing court weighs the evidence and determines whether the administrator made the correct decision, *Perry v. Simplicity Eng'g, Div. of Lukens Gen. Indus*., 900 F.2d 963, 966 (6th Cir. 1990), giving "no deference or presumption of correctness" to the administrator's decision.[7] *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002).

The LTD Policy provides that in order to be considered disabled, a plaintiff must prove he is "unable to perform all the material duties of *any* occupation for which he is or may reasonably become qualified based on his education, training, or experience." The WOP benefit similarly provides that a plaintiff must demonstrate she cannot do "*any* work for wage or profit."[8] The district court rejected McCollum's argument that his treating physician should receive more weight than Dr. Popovich, finding that the Supreme Court has explicitly declined to extend the treating physician rule to ERISA cases. *See generally Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) ("We hold that plan administrators are not obliged to accord special deference to the opinions of treating physicians."). Emphasizing that LINA presented evidence of two occupations suitable for McCollum, the district court concluded:

---

[7]Some courts have explained that the question on de novo review is "whether the plaintiff's claim for benefits is supported by a preponderance of the evidence." *Niles v. Am. Airlines, Inc*., 269 F. App'x 827, 833 (10th Cir. 2008) (unpublished opinion).

[8]Neither party contends that there is a meaningful distinction between the two definitions.

12

> Even taking Kellman's second [PAA] assessment as the most accurate statement of Plaintiff's abilities, Plaintiff is capable of sitting, standing, and walking, doing each for up to one third of a normal workday. He is likewise capable of a similar degree of use of his right hand for fine manipulation, and he can use both hands to that degree for simple grasping. Lifting up to ten pounds of weight and limited occasional pushing and pulling are also within his abilities. No relevant sensory limitations are indicated. Even making reasonable adjustment to account for the effect of his chronic pain and medication, the record nonetheless indicates that Plaintiff is not totally disabled. He undoubtedly suffers severe limitations, but they do not rise to such high level as to preclude all types of work for which he is suited.

*McCollum*, 2011 U.S. Dist. LEXIS 101205, at \*13-14 (citations omitted).

In this appeal, McCollum argues again that LINA and the district court erred by not giving appropriate weight to the opinions of Dr. Kellman and Dr. Kovan, who both opined that he was disabled. His treating physicians' opinions, he says, are based on objective medical evidence. He thus argues that LINA's determination that he could perform light work was erroneous. As a result, the TSA, which used a light-work classification in finding two suitable jobs, is likewise flawed. He further emphasizes that there is no satisfactory explanation for LINA's sudden about face after providing benefits for eleven years.[9]

LINA acknowledges that objective medical evidence supports McCollum's diagnosis of lumbar degeneration and spinal stenosis, as well as his reports of chronic lumbar pain.[10] It disputes,

---

[9]McCollum also argues that the Social Security disability determination should be considered as a factor in assessing whether he is disabled. But the Social Security finding is entitled to less weight because it occurred so long ago. *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010) (unpublished opinion) (noting that the quasi-estoppel rationale underlying giving a Social-Security disability determination more weight is minimized when the disability determination occurred years before); *see also Curry*, 400 F. App'x at 58.

[10]LINA makes much of the fact that Dr. Kellman's notes describe McCollum as having improved after his laminectomy. Although Dr. Kellman's notes show that the laminectomy improved McCollum's pain in his *legs*, Dr. Kellman also consistently states that McCollum continued to suffer from chronic back pain after the surgery. JA 162-171. And Dr. Kovan's office notes support that McCollum continued to experience chronic lumbar pain post-laminectomy. LINA

however, that McCollum's limitations are as severe as he claims and whether objective medical evidence supports the extent of his claimed limitations. Although a lack of objective medical evidence is a proper reason to deny disability benefits, *see Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157 (6th Cir. 2007) ("Requiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable."), there are problems with LINA's conclusion.

First, neither Dr. Popovich nor any of LINA's reviewing doctors physically examined McCollum. We have explained that "[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish v. Liberty Mutual/Liberty Life Assur. Co.*, 419 F.3d 501, 507-508 (6th Cir. 2005); *cf. Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296-97 (6th Cir. 2005) (reversing denial of benefits in part on basis that nontreating physician never met or examined claimant); *Jebian*, 349 F.3d at 1109 n.8 (citation omitted). Contrary to LINA's insistence that McCollum is attempting to introduce the treating physician rule into this case through the back door, nothing in *Nord* prohibits a court weighing the opinions between two physicians from taking into account that a nontreating physician has not personally examined the claimant.

Second, the only evidence in the record about McCollum's limitations are the PAAs from Dr. Kellman and Dr. Kovan. *Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 502 (6th Cir. 2008) (citation omitted) ("One method of objective proof of disability, for instance, is a functional capacity

---

also emphasizes that Dr. Kovan's notes describe McCollum's physical examinations as generally "non-focal" with respect to strength, reflexes, and sensation. But these same notes also explain that McCollum has severe pain and "horrific spinal stenosis," JA 103-06; JA 109-114, and a non-focal exam with respect to strength, reflexes, and sensation says little about McCollum's pain or degree of functional limitations.

14

evaluation, a 'reliable and objective method of gauging' the extent one can complete work-related tasks."). These doctors opine that McCollum is disabled. In the face of this evidence, LINA, which had the authority to force McCollum to submit to a FCE, opted not to. In fact, McCollum and Dr. Kellman both requested LINA have an independent physician examine him. "[T]he failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 295; *see also Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 396 (6th Cir. 2009); *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006) (*quoting Calvert* for proposition that a file-review when plan reserves the right to conduct a physical exam is suspicious).

Also problematic is LINA's reliance on the September PAA and its determination that McCollum could perform light work. Throughout its briefing, LINA conflates the distinction between light and sedentary work. But the "[p]hysical demand requirements [of light work] are in excess of those for Sedentary Work." *See* Dictionary of Occupational Titles, Appendix C: Components of the Definition Trailer, available at http://www.occupationalinfo.org/appendxc_1.html#STRENGTH (last visited July 3, 2012); *Cooper*, 486 F.3d at 169 (noting problem with non-treating physician conflating distinction between sedentary positions and light-duty positions). And Dr. Popovich's report, which is based on the September PAA, makes no mention of the November PAA whatsoever. The September PAA appears to be an aberration – all of Dr. Kellman's other PAAs classify McCollum as capable of sedentary work – that Dr. Kellman explicitly disavowed. LINA's reliance on it is unsupportable,

particularly in light of LINA's concession that it is operating under a conflict of interest. R.23 at PgID 194; *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009).

LINA's denial of benefits is even more surprising given the many years that it classified McCollum as disabled. *See, e.g.*, *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499 (6th Cir. 2009). LINA's attempt to distinguish *Kramer* is unavailing: the record belies LINA's assertion that McCollum's chronic lumbar pain, as opposed to his *leg* pain, improved after his laminectomy. To be sure, *Kramer* does not create a rule that when a plan administrator suddenly changes course, the administrator must have new evidence of improvement. But in those circumstances, the plan administrator must have some reason for the change based on any number of factors. *Morris*, 399 F. App'x at 984 (noting factors include evidence of improvement, a better definition of the participant's medical condition, or any new skills the participant has acquired). LINA has not provided any convincing reason, and its sudden about face casts doubt on its conclusion that McCollum is capable of light work after all these years.

Accordingly, reviewing the record de novo, we conclude that LINA improperly rejected McCollum's claim for disability benefits. But this does not mean that we conclude McCollum is disabled under the Policy or "clearly entitled" to benefits. *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621-22 (6th Cir. 2006) (addressing question of which remedy – retroactive benefits or remand to administrator – is appropriate). When, as here, "the plan administrator's decision suffers from a procedural defect or the administrative record is factually incomplete," the appropriate remedy is to remand to the plan administrator so that a "full and fair review can be accomplished." *Shelby County Health Care Corp. v. Majestic Star Casino, LLC Group Health Benefit Plan*, 581 F.3d 355, 372-73 (6th Cir. 2009); *see also Helfman*, 573 F.3d at 396 (remanding to district court when plan

16

decision incorrect but claimant not "*clearly* entitled to benefits") (citations omitted and emphasis added). Accordingly, we remand to the district court with instructions to remand to the plan administrator to provide a full and fair review.

**III.**

McCollum next disputes whether the district court abused its discretion in imposing a nominal penalty for Defendants' failure to promptly provide the SPD, as required by statute. ERISA requires a plan administrator to provide an SPD to a plan participant upon written request, 29 U.S.C. § 1024(b)(4), and the SPD is required to contain the name and address of the plan administrator. 29 U.S.C. § 1022. If a plan administrator fails to provide the required information within thirty days of a written request, ERISA grants district courts discretion to impose a civil penalty of up to $110 per day. 29 U.S.C. § 1132(c)(1); 29 C.F.R. 2575.502c-3. A plan administrator is not liable for any penalties when the failure to respond results from "matters reasonably beyond the control of the administrator." 29 U.S.C. §1132(c)(1). The district court exercised its discretion and imposed a $1,585 penalty, representing $5 per day for the 317 days Defendants did not respond. *McCollum*, 2011 U.S. Dist. LEXIS 101205, at *19.

A.      Doncasters's Successor Liability

The parties first disagree whether Doncasters, as the parent corporation of Fabristeel, may be held accountable for the penalty. The district court determined that Fabristeel was the plan administrator, a finding McCollum does not dispute. Reply Br. at 5; *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 580 (6th Cir. 2002) ("It is well established that only plan administrators are liable for statutory penalties under § 1132(c).") (citation omitted). Relying on *Smith Land & Improv. Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir. 1988), the district court held that Doncasters was not

17

liable for any penalty against Fabristeel, explaining that Fabristeel "survives as an entity separate and distinct from its shareholders even if all the stock is purchased by another corporation."[11] *McCollum*, 2011 U.S. Dist. LEXIS 101205, at \*16. Since Fabristeel is distinct from Doncasters, the district court held that Fabristeel alone was liable.

McCollum argues that the district court erred because Doncasters is liable as the successor to Fabristeel. "The general rule of corporate successorship accepted in most states is nonliability for acquiring corporations, with the following exceptions: The purchaser may be liable where: (1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company." *United States v. Gen. Battery Corp.*, 423 F.3d 294, 305 (3d Cir. 2005); *see also Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 259 (6th Cir. 2012) ("[A] successor corporation generally is not liable for its predecessors liabilities unless expressly assumed."). McCollum relies on the "mere continuation" exception. But he puts forth no evidence that Doncasters is a mere continuation of Fabristeel. *See generally IBC Mfg. Co. v. Velsicol Chem. Corp.*, 1999 U.S. App. LEXIS 15140 (6th Cir. July 1, 1999) (unpublished opinion) (explaining "mere continuation" test of liability).[12]

Relatedly, McCollum contends that a parent corporation is liable for activities of its subsidiaries if the parent dominates the subsidiary's activities. McCollum argues that "[a]n entity

---

[11]The parties apply Delaware law to the issue of corporate liability and do not raise any issue with choice of law.

[12]McCollum does not contend that successor liability in the ERISA context is different than common-law successor liability, and we therefore do not address that issue. *See, e.g., Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 91 (3d Cir. 2011) (distinguishing common-law successor liability from successor liability in ERISA context).

owning 100% of another certainly controls it." Appellant's Reply Br. at 1; *In re Tronox, Inc. Secs. Litig.*, 769 F. Supp. 2d 202, 210 (S.D.N.Y. 2011) (quoting *Grastly v. Michail*, 2004 WL 396388 (Del. Super. Ct. 2004)). The crux of McCollum's argument is that Doncasters owns all of the stock of Fabristeel. *Grastly* itself makes clear, however, that mere stock ownership of a subsidiary does not, by itself, prove the requisite degree of control. McCollum again provides no evidence that Doncasters exercises any significant degree of financial or operational control over Fabristeel.

Accordingly, the district court did not err in holding that Fabristeel alone is liable for the civil penalty.

### B. Nominal Penalty

The district court imposed a penalty against Fabristeel, rejecting Defendants' argument that the inability to locate an SPD was beyond their control. Nevertheless, according to the district court:

> No prejudice or bad faith has been shown in the instant case. Plaintiff readily identified the relevant parties, necessary substitution of Defendants was made by stipulation, and Defendants have admitted that de novo review applies. Apart from some minor delays and additional effort in determining the identity of the plan administrator and the nonexistence of the SPD, Plaintiff has not been prejudiced in any manner. Certainly, no legal rights of Plaintiff have been impinged.

*McCollum*, 2011 U.S. Dist. LEXIS 101205, at \*18. Hence, the district court imposed a "nominal penalty" of $5 per day. *Id.*

This court reviews a district court's decision on statutory penalties for abuse of discretion, which "exists when the reviewing court is firmly convinced that a mistake has been made." *See Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068 (6th Cir. 1994). Factors courts consider include "bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or

19

beneficiary." *Romero v. SmithKline Beecham*, 309 F.3d 113, 120 (3d Cir. 2002) (citation omitted); *accord Huss v. IBM Med. & Dental Plan*, 418 F. App'x 498, 508 (7th Cir. 2011). Although "[t]he circuits are in general accord that neither prejudice nor injury are prerequisites to recovery under the penalty provisions of the statute," *Moothart v. Bell*, 21 F.3d 1499, 1506 (10th Cir. 1994), a district court "may consider prejudice in exercising its discretion." *Knickerbocker v. Ovako-Ajax, Inc.*, 1999 U.S. App. LEXIS 16982, at *14 (6th Cir. July 20, 1999). The aim of statutory penalties is to punish violators and deter noncompliance. *Leister v. Dovetail, Inc.*, 546 F.3d 875, 883 (7th Cir. 2008); *Byars v. Coca-Cola Co.*, 517 F.3d 1256, 1271 (11th Cir.2008). In this regard, some courts also consider the administrator's ability to pay. *Leister*, 546 F.3d at 883 ("[T]he poorer the defendant, the lower the penalty can be set and still deter wrongdoers in the same financial stratum.") (citation omitted).

Although being forced to hire a lawyer or expend additional resources to obtain statutorily mandated information can potentially show prejudice, *see, e.g., Lowe v. McGraw-Hill Cos.*, 361 F.3d 335, 338 (7th Cir.2004) (finding prejudice when claimant forced to hire lawyer); *Curry v. Contract Fabricators, Inc. Profit Sharing Plan*, 891 F.2d 842, 847 (11th Cir. 1990) (noting that aggravation and frustration can constitute prejudice); *Gatlin v. Nat'l Healthcare Corp.*, 16 F. App'x 283, 289 (6th Cir. 2001) (unpublished opinion) (noting that prejudice results from "hindering plaintiff's ability to appeal the decision at the earliest opportunity), McCollum's counsel conceded at oral argument that he did not put forth any evidence about the additional costs – in terms of time or money – McCollum incurred as a result of the Defendants' actions. The district court's determination that McCollum experienced a minor delay is not an abuse of discretion. *Mullins v. AT&T Corp.*, 424 F. App'x 217, 225 (4th Cir. 2011) (affirming award of $25 per day when claimant not prejudiced by delay); *see also*

20

*Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 589 (1st Cir. 1993) (affirming denial of penalty when claimant failed to show how delay caused harm); *Dube v. J.P. Morgan Investor Servs.*, 201 F. App'x 786, 787-88 (1st Cir. 2006) (unpublished opinion) (affirming denial even when delay made claim process more difficult or frustrating).

Further, although the Defendants' failure to inform McCollum that they were searching for the SPD is not admirable, their conduct does not amount to malfeasance or bad faith. *Adono v. Wellhausen Landscape Co.*, 258 F. App'x 12, 16 (7th Cir. 2007) (unpublished opinion) (declining to increase statutory award of $10 per day when delay was not result of malfeasance). In fact, McCollum's first two requests for the SPD were addressed to CIGNA, and he only requested the SPD from Fabristeel twice. As Defendants point out, McCollum already possessed the most important document, the Policy itself. *Ames v. American Nat'l Can Co.*, 170 F.3d 751, 760 (7th Cir. 1999) (upholding denial of benefits when plaintiffs had relevant portions of pertinent document available to them). And courts often impose a lower penalty to "reflect the lack of injury and the limited prejudice." *Moothart*, 21 F.3d at 1506 (10th Cir. 1994). These facts persuade us that the district court's award of a nominal penalty was not an abuse of discretion.

Accordingly, we affirm the district court's decision on the statutory penalty.

## IV.

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to LINA and REMAND to the district court with instructions to remand to the plan administrator to provide a full and fair review. We AFFIRM the district court's decision on the issue of statutory penalties.